UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DAWN GORTON,                                           CIVIL NO.  06-4903 (PJS/JSM)

      Plaintiff,

v.                                                     <u>REPORT AND RECOMMENDATION</u>

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 15].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that the plaintiff's Motion for Summary Judgment be **DENIED** and that the defendant's Motion for Summary Judgment be **GRANTED**.

## I.     FACTUAL BACKGROUND

Plaintiff's application for disability insurance benefits and Supplemental Social Security Income under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423 1382c, was initially filed on April 26, 2002.  Tr. 67-69, 372-73.  Plaintiff claims she became disabled as of January 1, 1999, due to major depression and borderline personality disorder.  Tr. 82.

The Social Security Administration ("SSA") denied plaintiff's applications initially and upon reconsideration.  Tr. 35-45, 48-50, 374-79.  Plaintiff filed a request for a hearing by an Administrative Law Judge.  Tr. 34.  Plaintiff, who was represented by

legal counsel, received a hearing before the Administrative Law Judge Diane Townsend Anderson ("ALJ") on March 8, 2004.  Tr. 21.  Testimony was taken at the hearing from plaintiff.  Tr. 21, 383.  In addition, testimony was taken from neutral medical expert Harry Hoberman, Ph.D. ("ME"), and vocational expert ("VE") Juletta Harren.  Id.  On August 11, 2004, the ALJ issued a decision to deny plaintiff benefits.  Tr. 18-19, 32. Plaintiff filed a Request for Review of the ALJ's decision with the Appeals Council. Tr. 16-17.  The Appeals Council denied plaintiff's request for review and upheld the ALJ's decision denying benefits to plaintiff, making the ALJ's findings the final decision of defendant.  Tr. 10-11.  See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing the instant action with this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The matter is now before the Court on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 15].

## II.    PROCESS FOR REVIEW

Congress prescribed the standards by which Social Security disability benefits may be awarded:  "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).   The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C.

§ 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.   42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§ 404.1509, 416.909.

### A.   <u>Administrative Law Judge Hearing's Five-Step Analysis</u>

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.   20 C.F.R. §§ 404.909(a)(1), 416.1409(a).   A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.   42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929., 416.1429, 422.201 <u>et seq</u>.   To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience.   <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>see also</u> <u>Locher</u>, 968 F.2d at 727.   The Eighth Circuit described this five-step process in <u>Morse v. Shalala</u>, 16 F.3d 865, 871 (8th Cir. 1994), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment.   If so, the claimant is not disabled.   If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.   If not, the claimant is not disabled.   If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.   The fourth step asks if the claimant's impairments prevent her from doing past relevant work.   If the claimant can perform past relevant work, she is not disabled.   The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.   If so, the claimant is disabled.

(citing 20 C.F.R. § 416.920).

**B.**   **Appeals Council Review**

If a claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon a claimant unless the matter is appealed to Federal District Court within 60 days of notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.**   **Judicial Review**

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps.   The Court is required to review the administrative record as a whole and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of plaintiff's impairments.

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  "We

may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision.'" Callison v. Callahan, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (citations omitted).

The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1 (1992); Buckner, 213 F.3d at

1011; <u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Gavin v. Apfel</u>, 811 F.2d 1195, 1199 (8th Cir. 1987).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  <u>See</u> 20 C.F.R. §§ 404.1512(a), 416.912(a); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260 (8th Cir. 1991).  Once a claimant has demonstrated that he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  <u>Martonik v. Heckler</u>, 773 F.2d 236, 238 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   <u>Vocational Background</u>

Plaintiff was 32 years old at the time of the ALJ's decision.  Tr. 32, 67.  She has received a General Equivalency Diploma ("GED").  Tr. 88.  Plaintiff has worked in the past as a cashier, receptionist and program counselor. Tr. 83.

### B.   <u>ALJ's Findings of Fact</u>

The ALJ concluded that plaintiff was not entitled to disability insurance benefits under §§ 216(i) and 223 of the Social Security Act.  Tr. 33.  The ALJ based this decision on the following findings:

1.   The claimant met the special earnings requirements of the Act relative to disability on January 1, 1999, the date the claimant stated she became unable too work.

2.   The claimant has not engaged in any substantial gainful activity since January 1, 1999.

3.   The medical evidence establishes that the claimant suffers from chronic low back pain, of mild severity, secondary to a previous motor vehicle accident and scoliosis; a depressive

disorder, NOS; an anxiety disorder, NOS; a mixed personality disorder with borderline traits; and a compulsive gambling disorder.  At no time in question has the claimant had an impairment or combination of impairments of sufficient severity to meet or equal a listed impairment contained in Appendix 1.

4.      The claimant's subjective complaints are not fully credible, and are not consistent with the objective medical finding of record, or with the claimant's wide and varied range of activities of daily living.  The evidence shows that the claimant's psychological condition stabilizes quickly if she is motivated to follow-through with prescribed treatment.

5.      The claimant, at age 32, is a "younger individual," and she has a twelfth grade education.  Her work history consists of employment as a retail cashier, fast food worker, daycare assistant, and home health aide.

6.      At all times in question, the claimant had retained the residual functional capacity to engage in a modified range of light work activity, work involving occasional lifting/carrying of up to 20 pounds, and more frequent lifting/carrying of up to 10 pounds, with the claimant capable of standing/walking for 6 out of 8 hours and sitting for 2 out of 8 hours, provided such light work involved only simple, routine, repetitive unskilled tasks; is performed in a low stress environment, with no complex decisions or instructions involved in performing the job; which involves only brief and superficial contact with co-workers, supervisors and the public; and which involves no more that occasional bending, stooping and crouching.

7.      Within the claimant's residual functional capacity as set forth above, she can still perform her past relevant work as a fast food worker, an unskilled job that is performed at the light exertional level, with this job existing in significant numbers in the national and regional economy.

8.      In addition to retaining the residual functional capacity to engage in the duties required by her past relevant work as a fast food worker, the claimant is also capable of performing a variety of simple, unskilled, low stress packaging positions which exist in significant numbers in both the national and regional economy.

9.      The claimant has not been under a "disability" as defined in the Social Security Act, at any time on or prior to the date of

this decision, as at all times in question, jobs within her residual functional capacity have existed in significant numbers in both the national and regional economy.

Tr. 31-32.

### C.   ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step procedure.  At the first step, the ALJ concluded that plaintiff had not engaged in any substantial gainful activity since the alleged onset of disability and, therefore, plaintiff's application for benefits could not be denied because of work experience.  Tr. 26.  At the second step, the ALJ found that plaintiff had severe impairments based on the objective medical evidence and her alleged symptoms.  Id.  At the third step, the ALJ determined that the record did not establish that plaintiff was subject to any impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 27.  At the fourth step, the ALJ found that plaintiff had the residual functional capacity ("RFC") to engage in a modified range of light work.  Id.   Given this RFC, the ALJ determined that plaintiff was capable of performing a significant number of jobs in the national economy, including fast food worker and light packaging positions.  Tr. 30.

## IV.   ISSUES UNDER REVIEW

In the present case, the ALJ determined that plaintiff maintained the following RFC:

At all times in question, the claimant had retained the residual functional capacity to engage in a modified range of light work activity, work involving occasional lifting/carrying of up to 20 pounds, and more frequent lifting/carrying of up to 10 pounds, with the claimant capable of standing/walking for 6 out of 8 hours and sitting for 2 out of 8 hours, provided such light work involved only simple, routine, repetitive unskilled tasks; is performed in a low stress environment,

> with no complex decisions or instructions involved in performing the job; which involves only brief and superficial contact with co-workers, supervisors and the public; and which involves no more that occasional bending, stooping and crouching.

Tr. 31.

Plaintiff disagrees with this RFC determination.   In this regard, plaintiff asserts the ALJ erred: (1) in failing to give proper weight to the opinions of her treating psychologist and instead, improperly substituted her own lay opinion; (2) in failing to give proper consideration to plaintiff's psychiatric impairment as a good reason for failing to follow prescribed treatment; and (3) in failing to follow proper principles of law in determining plaintiff's credibility.   See Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Mem.") at p. 9.   In addition, plaintiff argued that the ALJ erred by improperly relying upon vocational testimony that was not based on a proper hypothetical and did not consider the publication titled the "The Selected Characteristics of Occupations."   Id.

## V.   PLAINTIFF'S RFC

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).   The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments.   See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).   It is the claimant's burden, not the Commissioner's, to prove the RFC.   Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).   In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.   Id.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'" Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)). The ALJ is not limited to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional." Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)). If necessary, the ALJ should solicit opinions from claimant's treating physicians, or seek consultative examinations to help assess claimant's RFC. Nevland, 204 F.3d at 858.

## A.      Opinion of Treating Psychologist

The social security regulations provide that "a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). Absent these two requirements, the ALJ need not accord controlling weight to a treating physician's opinion and the ALJ may not give a treating physician's opinion controlling weight based solely on the fact that he or she is a treating physician. Id. at 1013. In addition, the ALJ is not required to assign special weight to a medical source's opinion on an issue reserved for the Commissioner. See 20 C.F.R. § 404.1527(e)(1) (stating "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will find that you are disabled").

Plaintiff maintains that the ALJ did not accord the proper weight to the opinions of plaintiff's primary treating psychologist, Brian Putz, M.A., with regards to her RFC, and instead, the ALJ improperly substituted her own lay opinion.  See Pl.'s Mem. at pp. 9-12.  In her decision, the ALJ stated that she had considered the January 2004 assessment prepared by Putz, where he opined that plaintiff had poor or no ability to follow work rules, relate to co-workers, interact with supervisors, or deal with work stresses, and that plaintiff had a difficult time maintaining focus and attention, and had very few coping mechanisms.  Tr. 28.  However, relying on the ME, the ALJ concluded that Putz's opinions were not supported by the objective medical evidence, particularly in light of a January 2003 neuropsychological evaluation of plaintiff showing that while she had slowed processing speed and impaired learning and memory, her evaluation was otherwise normal across cognitive areas.  Tr. 28.

### 1.   Medical Records and Opinions of Putz

After reviewing all of the medical records submitted to the ALJ, including the reports, the opinions of Putz, and the testimony of the ME at the hearing, this Court finds that the ALJ gave Putz's opinions their proper weight.

On January 25, 2002, plaintiff was seen by Resident Monte Johnson.  Tr. 194.  Plaintiff represented that she was first diagnosed with depression in 1996.  Id.  When asked to describe her depression, plaintiff stated that she had "bad thoughts".  Id.  She had a history of self-destructive behavior including pulling her hair out, but denied any suicide attempts.  Id.  She also represented that she experienced symptoms of anxiety once or twice a week.  Id.  She was diagnosed with depression and probable generalized anxiety.  Tr. 195.

On February 12, 2002, plaintiff saw a Dr. Susan Czapiewski, M.D. regarding a medication refill.  Tr. 188.  Plaintiff told Dr. Czapiewski that she was not presently depressed and her depression really depended on what was going on in her life.  Id. Plaintiff stated that she felt anxious about trying to find a job, about going to places where there are a lot of people and had anxiety about looking people in the face.  Id. She also told Dr. Czapiewski that she went to the casino one to two times per week.  Id. Plaintiff described significant episodes of being out of control anger after provocation. Id.  The only medication plaintiff reported taking was Celexa.  Tr. 189.  Dr. Czapiewski noted that plaintiff's gaze was direct, that her affect was bland and disconnected from the content of some of the things she was saying, her thought process was goal-oriented but vague, she denied any psychosis or suicidiality, had fair insight and judgment and a below average intelligence.  Id.  Dr. Czapiewski's assessment of plaintiff included social phobias, depression and probable borderline personality disorder.  Id.  Dr. Czapiewski recommended that plaintiff seek dialectical behavior therapy ("DBT") for her borderline personality disorder.  Tr. 190.

The first time plaintiff went to Putz for treatment was on March 27, 2002.  Tr. 218. Plaintiff presented with complaints of depression and anxiety.  Id.  Plaintiff also represented that there were two persons inside of her—Dawn and "Jenna", the bad person.  Id.  While plaintiff stated she had previous in-patient treatment, Putz noted that there was no reports of in-patient treatment for any mental issues.  Id.  The only medications that plaintiff reported taking were Celexa and Zoloft.  Tr. 219.  Putz diagnosed plaintiff with depression.  Tr. 222.  In an April 8, 2002 progress report, Putz reported that plaintiff was coping more, but at the same time, noted that plaintiff told her boyfriend that she was going to kill herself.  Tr. 217.  On April 22, 2002, plaintiff reported

to Putz that she had left her boyfriend's house and was living in a shelter.   Tr. 215.

Putz's treatment plan for plaintiff was to increase stability in her relationships and to

make improved choices.   Id.

On May 3, 2002, plaintiff told Putz that she had moved back in with her boyfriend.

Tr. 214.   Putz's diagnosis for plaintiff was bipolar disorder (296.6).   Id.   The treatment

plan for plaintiff was to practice relaxation and to schedule a psychiatric appointment.

Id.   On May 9, 2002, Putz reported that plaintiff's environment was stable.   Tr. 213.

Plaintiff reported twitching movement in her body and impulsive behavior.   Id.

According to Putz, plaintiff missed her psychiatric appointment.   Id.   Plaintiff was

diagnosed with bipolar disorder (296.6).   Id.

On June 25, 2002, a state agency psychologist Jan Konke, reviewed  plaintiffs'

medical records and spoke with Putz.   Tr. 211-12, 230-32.   Putz told Konke that plaintiff

was socially active, had a good social support system, liked to go out with friends, had

and had attended school in the past.   Tr. 212.   Putz also indicated that plaintiff had

improved on medications and her prognosis was fair, that she was reasonably bright

and able to understand simple and detailed instructions, and that she appeared to

tolerate more than brief and superficial interactions.   Tr. 212.   Based on her

conversation with Putz and her review of plaintiff's medical records, Konke concluded

that plaintiff had the mental residual functional capacity to concentrate on and

understand routine, repetitive tasks, and three and four step uncomplicated instructions,

but would have moderate problems with detailed, and marked problems with complex,

instructions.   Tr. 232.   Konke also found that plaintiff's ability to carry out tasks with

adequate persistence and pace would be moderately impaired, but adequate for

routine, repetitive tasks, but not for detailed or complex tasks; plaintiff's ability to interact

and get along with co-workers and the public was found to be moderately impaired, however, adequate for brief and superficial contact; plaintiff's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customer work settings; and plaintiff's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.   Id.   Dr. Alsdurf, another state agency psychologist, reviewed plaintiff's file, and affirmed Konke's evaluation.  Tr. 232, 239.

On August 1, 2002, plaintiff went to the emergency room at Fairview-University Medical Center complaining that, "I don't want to be here anymore."  Tr. 359.  Plaintiff was seen by Dr. Barry Rittberg, M.D.  Plaintiff stated that she had been depressed on-and-off for seven yeas with a recent worsening in mood, especially in her irritability, and decided that she was tired of feeling this way.   Id.   She reported being mean to her husband and a female roommate, and blamed it on her split personality, "Jenna."  Id. Plaintiff noted decreased energy, decreased motivation and a decreased interest in things that normally give her pleasure.  Id.   However, plaintiff reported normal levels of sleep, a normal appetite and normal concentration.  Id.   Plaintiff did not report any manic symptoms or panic symptoms, but did claim crawling of skin due to anxiety.  Id. Plaintiff also reported that causing physical pain to herself helps with her emotional pain.  Id.   Dr. Rittberg, diagnosed plaintiff with depressive disorder NOS, anxiety disorder NOS and a borderline personality disorder by patient history.   Tr. 361. Dr. Rittberg assigned plaintiff a Global Assessment of Functioning score of 20[1]  Id.

---

[1]      The Global Assessment of Functioning scale is used to assess an individual's overall level of functioning.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).   The lower the score, the more serious the individual's symptoms.  See id.   A GAF of 65 would indicate mild symptoms (eg., depressed mood

Plaintiff was discharged from Fairview-University Medical Center on August 9, 2002.  Tr. 354.  Dr. Rittberg reported that her mood had improved to a level that she reported that she was feeling "quite good."  Id.  According to Dr. Rittberg, plaintiff's affect was appropriate, congruent, cheerful and conversational with good eye contact. Id.  In addition, plaintiff's thoughts were logical, goal orientated and coherent.  Id.  Her judgment and insight were good and age appropriative.  Tr. 355.  Plaintiff denied her prior feeling of crawling skin and denied any recent active or passive suicidal or homicidal ideations.  Tr. 354.  One day prior to her discharge, plaintiff was allowed a pass to go out with her husband and her daughter, and she reported that she did not feel any increased return of stress, depression, or thoughts of self-injury.  Id.  Plaintiff was placed on Effexor[2] to address her anxiety and her depression and Depakote[3] to address mood instability and possible borderline traits.  Id.  Plaintiff tolerated both medications well upon discharge.  Id.  Plaintiff's discharge diagnosis was major depressive disorder, anxiety disorder NOS, borderline personality traits and a GAF of 65.  Id.

---

and mild insomnia), or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, having some meaningful interpersonal relationships. See Diagnostic And Statistical Manual Of Mental Disorders 34 (4th ed. Text Revision). A GAF of 60-51 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and coworkers.  Id.  A GAF of 20 is indicative of some danger towards others, including suicide attempts without clear expectation of death or serious symptoms including suicidal ideation or gross impairment in speech.  Id.

[2]     Effexor: "Prescribed for depression and generalized anxiety disorder." THE PILL BOOK (2002).

[3]     Depakote: "Prescribed for bipolar disorder . . .  and anxiety or panic attacks." THE PILL BOOK (2002).

On September 8, 2002, Putz filled out Medical Assessment to Work-Related Activity (Mental) form regarding plaintiff.  Tr. 203.  The form contained spaces for the provider to mark whether a patient had a very good, good, fair, or poor ability to conduct a work-related task.  Id.  With regards to making occupational adjustments, Putz found that plaintiff had a good ability to follow work rules; a fair ability to relate to co-workers, deal with the public, use judgment, and interact with supervisors; and a poor ability to deal with work stress, function independently, and maintain concentration.  Tr. 203-04.  In a narrative, Putz opined that plaintiff would likely demonstrate inconsistent attendance due to emotional liability and impulsive behavior.  Tr. 204.  With respect to making work performance adjustments, Putz found that plaintiff had a fair ability to understand, remember and carry out complex job instructions; a good ability to understand, remember and carry out detailed job instructions; and a good ability to carry out simple job instructions.  Id.  In his narrative, Putz noted that plaintiff might not perform effectively when stress is increased, due to her bipolar disorder, which was apt to make her make questionable decisions in uncomfortable situations.  Id.  As to making personal-social adjustments, Putz checked that plaintiff had a fair ability to maintain her personal appearance, and a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  Tr. 205.  Putz made these findings on the basis of plaintiff's history of chaotic interpersonal relationships and threatened suicide in response to difficulties in relationships with men in the past.  Id.  Putz opined that plaintiff had the ability to manage benefits in her own best interest.  Id.

On September 10, 2002, plaintiff reported to Putz that she had gotten married in Las Vegas, started school again and had started a new job.  Tr. 210.  She also noted impulsive behavior with regards to going to casinos and a chaotic home life.  Id.

Plaintiff's medication included Effexor and Depakote.  Id.  Putz's diagnosis for plaintiff was borderline personality disorder and bipolar disorder.  Id.  The treatment plan for plaintiff was to seek help from a psychiatrist and to educate her regarding bipolar issues and impulsive behaviors.  Id.  The reports of gambling continued at the September 17, 2002 appointment and Putz wanted to address plaintiff's impulsiveness with regards to her gambling and get her into a support group.  Tr. 209.

On September 27, 2002, Putz reported that plaintiff was having a difficult time remembering things, had cut herself with knife on her leg and reported a decrease in gambling.  Tr. 208.  Putz's treatment plan was to review healthy relationships.  Id.  On October 15, 2002, Putz noted that plaintiff was going to school during the day and getting along with her husband.  Tr. 207.  She also reported filling out an application for work.  Putz's diagnosis for plaintiff was borderline personality disorder (301.83) and bipolar II disorder (296.89).  Id.  Putz's treatment plan for plaintiff was to have her fill out applications, obtain employment and to structure her thoughts through journaling.  Tr. 207.

On January 19, 2003, plaintiff went to the emergency room at Methodist Hospital.  Tr. 228.  Plaintiff stated that she had wanted to go to the casino and her husband did not want to go with her and started calling her names.  Id.  She reported hitting her husband and then leaving.  Id.  When her husband would not talk to her, she claimed that she became suicidal with thoughts of taking her pills and driving into a wall with her car.  Id.  Plaintiff thought it would be better for her to come the hospital, as opposed to being unsafe at home.  Id.  Eventually, plaintiff went to the Fairview-University Medical Center where she was seen again by Dr. Rittberg.  Tr. 228-29 Her chief complaint was that she had a gambling addition.  Tr. 229.  Plaintiff represented that she had a

psychiatrist, but that she last saw her in September or October of 2002,[4] and had missed all subsequent appointments.  Tr. 228.  She also stated that she had not seen Putz in a few months.  Id.

Dr. Rittberg performed a mental status examination of plaintiff and noted that plaintiff made good eye contact and was engaging throughout the interview; her speech was fluent with normal rate and rhythm; her mood was "depressed"; her affect was calm and pleasant; she had no current suicidal ideations; she denied any hallucinations, displayed no signs of psychosis or delusions, and had poor insight and judgment. Tr. 229.  Dr. Rittberg's diagnosis of plaintiff included bipolar affective disorder; borderline personality disorder; psychosocial stressors dealing with her husband.  Id. Dr. Rittberg assigned plaintiff with a GAF of 35.  Id.  Dr. Rittberg opined that while plaintiff presented with suicidal ideation, it was probably secondary to personality disorder.  Id.  Plaintiff was admitted.  Id.  Plaintiff was also found to be suffering from a severe level of depression.  Tr. 369.

A January 24, 2003 treatment note by Dr. Rittberg stated that plaintiff had expressed anger that staff were talking about discharging her without anything changing in the way she felt, and that she had difficulty comprehending that it was difficult effecting immediate change in such a chronic disorder.  Tr. 366.  Plaintiff reported having difficulty describing her internal emotions and having a poor memory.  Id.  She reported that she had no current problems with reading or arithmetic, but that she had difficulty remembering things moment to moment.  Id.  Dr. Rittberg also reported

---

[4]     The Court was unable to find any treatment notes from Dr. Czapiewski's for September or October, 2002.  The records from Dr. Czapiewski only address sessions from January to February 2002 and again from February to December 2003. Tr. 188-195, 284-89.

speaking with plaintiff about her gambling disorder in the context of her borderline personality disorder.  Id.  Since her gambling problem was causing her the most acute distress for herself and for her relationship with her husband, Dr. Rittberg spoke to plaintiff about being admitted into a gambling treatment facility.  Id.  A case manager was able to secure a space at the treatment facility by the upcoming Monday, however, plaintiff contacted the treatment center without consulting with staff, and stated she would not be ready before Wednesday at the earliest.  Id.  Plaintiff also reported to Dr. Rittberg that she had filed for Social Security Disability and that she was "hoping that this hospitalization [would] be helpful in her obtaining Social Security Disability."  Id.  Dr. Rittberg told plaintiff the more relevant issue to her obtaining a benefit was her noncompliance with outpatient recommendations and the lack of follow-through with the prescribed treatment plan on her part.  Id.

Dr. Rittberg's mental status exam of plaintiff showed that she was adequately groomed and attired, her affect was flat, she was quite passive except when it came to criticizing staff and the treatment that she had not received, and she denied present suicidal thoughts.  Tr. 367.  Dr. Rittberg noted that when he talked about plaintiff's memory difficulties, her mood seemed to brighten, especially when they discussed getting neuropsychological testing.  Id.  Dr. Rittberg noted in his report that after plaintiff's previous hospitalization, there had been put in place a well thought-out discharge plan for continued follow-up with plaintiff's psychiatrist and individual therapist and her attendance in a DBT program.  Id.  However, Dr. Rittberg found that plaintiff's follow-through with her prescribed treatment was poor.  Id.  Dr. Rittberg also stated that there was an indication that she was telling different staff different things and was conveniently leaving out things she found disagreeable with staff recommendations.  Id.

Dr. Rittberg's assessment of plaintiff was she was suffering from borderline personality disorder. Tr. 367.  He also found plaintiff to be quite passive and hostile with poor insight into her behavior.  Dr. Rittberg expressed his interest of discharging plaintiff for the benefit of the other patients, but first wanted determine if there was an organic component to her memory problems, which would be measured by neuropsychological testing.  Id.  According to Dr. Rittberg, information from this testing would "be helpful in determining if her lack of follow-through is from noncompliance or from poor cognitive processing."  Id.  Dr. Rittberg felt that she would be best suited by treatment in a gambling treatment facility.  Id.

Plaintiff underwent a neuropsychological evaluation with Dr. Erin Hoker, Ph.D., LP on January 24, 2003.  Tr. 362.  Plaintiff represented that had increasing difficulty with her memory, attention and word finding.  Id.  Plaintiff also reported that she had difficulty remembering things she did earlier in the day.  Id.  Plaintiff asserted that she had worked most recently as a video store clerk, which she quit in August of 2002, and that she had been enrolled in a medical assistant training program at a vocational school up to December of 2002.  Tr. 363.  Dr. Holker, described plaintiff as pleasant and cooperative and appeared to understand the instructions provided to her.  Id.  While plaintiff became easily frustrated on many of the tests administered to her, she willingly continued with encouragement.  Id.

The results from the tests administered to plaintiff revealed that plaintiff's overall intellectual functioning was average.  Id.  Dr. Hoker's impressions and recommendations for plaintiff were as follows:

> The current results reveal slowed processing speed, and predominately impaired learning and memory, in the context of performance that otherwise falls within normal limits across cognitive domains.

> This pattern of performance may reflect diffuse cerebral involvement, with no evidence of lateralization of cognitive impairments.  It is likely that her impaired learning is the result of slowed information processing speed.  The etiology is likely multifactoral, including the effects of depressed mood, medications, chronic pain, and non-restorative sleep. Although unlikely, given the given the prominent impairment in memory, the possibility of an organic etiology cannot be ruled out, and if not already considered, she may benefit from further neurological evaluation. Repeated neuropsychological evaluation in one year may help determine whether her cognitive difficulties progress, remit, or remain stable.
>
> In terms of daily functioning, Ms, Gorton-Vescera will likely be able to participate actively in her own treatment; however, she will likely have difficulty remembering information. Others may assist by encouraging her to write down important information in a small notebook that she caries with her, repeating important information, and providing written information when possible.  She will likely take longer to complete tasks, and it may be helpful to provide her with extra time.

Tr. 364-65.

Plaintiff was discharged from Fairview-University Medical Center on January 24, 2003.  Tr. 223.  In his discharge report, Dr. Rittberg stated that plaintiff was restarted on Depakote that was prescribed to her the last time she had been admitted in August of 2002.  Id.  While plaintiff continued to complain of anxiety, Dr. Rittberg noted that she was observed to labile in the unit and would easily get angry or irritated if she did not get her way, and had a tendency to spilt staff in order to get what she wanted.  Tr. 223. She was encouraged to follow-through and have a gambling consult with Dr. Kim after she finished with her gambling program.  Id.  According to Dr. Rittberg, plaintiff's neuropsychological testing results indicated moderate impairment in memory and learning and mildly slow processing speed, with performance otherwise falling within normal limits for her age.  Tr. 224.  Dr. Rittberg noted that her impairments might cause

her to have difficulty remembering information given during treatment and it was recommended that she be provided with written materials in order to maximize treatment.  Id.

Plaintiff was discharged and was seen as ready to start in outpatient treatment to manage her gambling and borderline personality disorder.  Id.  Plaintiff was told to take Dekapote, Effexor and was given Seroquel[5] to take if she became to anxious or agitated, secondary to her urge to gamble.  Id.  She was also given clear instructions on her follow-up upon discharge, which included an appointment with her psychiatrist Dr. Czapiewski, a follow-up with the Fairview Medical Center Psychiatric Outpatient clinic with Dr. Kim, admission to the Vanguard Gambling Program, outpatient counseling with Putz and an instruction to set up DBT.  Tr. 224-25.  Dr. Rittberg's discharge diagnosis was that plaintiff was suffering from depression disorder NOS; compulsive gambling; borderline personality disorder; and psychosocial stressors dealing with her husband and her financial situation secondary to her gambling problem, and also pertaining to her daughter.  Tr. 223.  Dr. Rittberg assigned plaintiff with a GAF of 55-60.  Id.

Plaintiff was admitted to the Vanguard Gambling Program on January 29, 2003.  Tr. 315.  While at the Vanguard Gambling Program, plaintiff was diagnosed as a compulsive gambler.  Tr. 321.  Treatment center staff reported that plaintiff was quiet during group time, gave minimal feedback to group members, and had difficulty listening to feedback from the group.  Tr. 316.  Plaintiff also appeared to have difficulty understanding compulsive gambling as an addiction, and while she was able associate

---

[5]     Seroquel: "Prescribed for psychotic disorder and schizophrenia." THE PILL BOOK (2002).

some her problems with her gambling, she had difficulty recognizing the relationship between her gambling and her emotions.   Id.   Plaintiff's husband came to the program to see her, and told her she had to leave, so she did on February 17, 2003.   Tr. 297, 316-17.   Plaintiff was discharged against advice of staff.   Tr. 317.   Plaintiff spent a total of 19 days in the Program.   Tr. 315.   No aftercare plan was developed for plaintiff because she left the program early.   Tr. 317.

On February 24, 2003, plaintiff was seen by Putz.   Tr. 313. Plaintiff reported to Putz that she had left the gambling treatment center and went straight to a casino.   Id. She also reported that she had only attended one Gamblers Anonymous meeting.   Id. She also claimed that she lacked the ability to focus and stay on task.   Id.   The treatment plan for plaintiff was to attend Gamblers Anonymous meetings regularly and to stay complaint with her medications.   Id.

On February 25, 2003, plaintiff was seen for a follow-up to her hospitalization with Dr. Czapiewski.   Tr. 297. Dr. Czapiewski reported that plaintiff went from the Fairview-University Medical Center to the gambling treatment center, where she was to stay for 30 days, but that she left the program early.   Id.   Plaintiff did report going to her first Gamblers Anonymous meeting and that she planned to go twice every week. Tr. 297.   Plaintiff claimed she tried to go back to the treatment center but they could do nothing for her.   Id. She reported to going to her therapist but stated that she was not going to DBT (although she acknowledged she should go) because she did not know which program was covered by her insurance.   Id.

Plaintiff complained that she felt like she was "messed up", depressed and anxious.   Id.   Plaintiff also stated that she felt out of control because her ex-husband would not let her see their daughter.   Tr. 298.   Plaintiff claimed that she would not kill

herself and was not suicidal.  Id.  While plaintiff claimed that "nothing" kept her going, she did claim that she was still around for her daughter.  Id. Plaintiff also told Dr. Czapiewski that the Seroquel may be helping her deal with her anxiety.  Id.

Dr. Czapiewski reported that plaintiff was casual and somewhat sloppily dressed, her affect was bland without much modulation, she expressed multiple problems that she felt she could not control, and that there was no evidence of psychosis or sucidiality.  Id.  Dr. Czapiewski's assessment was that plaintiff was suffering from borderline personality disorder, compulsive gambling, and possible atypical bipolar disorder.  Id.  While Dr. Czapiewski stated that plaintiff's prognosis was guarded, she also indicated that plaintiff had said that her current medications have helped her.  Id.

She saw Putz on April 2, 2003.  Tr. 311.  Again she focused on her disagreements with her ex-husband and the fact that she had not seen her daughter since the last summer.  Id.  She reported going to the casino on the previous Saturday. Id.  She also stated that she got a job at Burger King.  Id.  Plaintiff indicated that she was fatigued and was unable to feel good about herself.  Id.  Plaintiff was diagnosed with Bipolar II Disorder (296.89).  Id.  Her treatment plan was to feel good about herself and say "no" to going to the casinos, begin work and stay compliant with her medications.  Id.

Plaintiff saw Dr. Czapiewski again on April 8, 2003.  Tr. 295.  Plaintiff reported doing "alright" and that she was stable except for her gambling.  Id.  Plaintiff claimed that she experienced craving for gambling and reported feeling anxious when she does not go to the casino, which manifested itself in pacing, an inability sit still, a desire to break something, and thoughts of pulling hair.  Id.  Plaintiff asserted that she was not suicidal.  Id.  Plaintiff asserted that the Seroquel was not helping her with her gambling

problem.  Id.  Plaintiff also told Dr. Czapiewski that she had not attended Gamblers Anonymous and that she has days where she is motivated to go and days she is not. Id.  Plaintiff also reported that she had started a part-time job at Burger King.  Id. Dr. Czapiewski observed that plaintiff was neatly dressed, displayed good eye contact and a bland affect with little modulation.  Id.  Plaintiff's thought process was goal-orientated, she displayed good insight and her judgment was reported as fair.  Id. Dr. Czapiewski's assessment was that plaintiff was suffering from borderline personality disorder, compulsive gambling, and bipolar disorder, but that her major problem was her gambling.  Tr. 296.  Plaintiff was told to continue the Effexor and Dekapote, as well as try Naltrexone.  Id.  Plaintiff was also encouraged to attend Gamblers Anonymous and to participate in DBT therapy.  Id.

Plaintiff next saw Dr. Czapiewski on June 24, 2003.  Tr. 293.  Plaintiff had missed her previous appointment.  Id.  Plaintiff reported that she was doing well and had no complaints of depression or mood swings, although there were certain things that would "set her off."  Id.  Plaintiff did claim racing thoughts relating to ex-husband and her daughter, making her at times unable to sleep at night.  Id.  She reported that she felt hopeful that things would get better.  Id.  Plaintiff also stated that she is gambling once every two weeks and stated that she did not start taking the Naltrexone because she was not having any gambling cravings.  Id.  However, plaintiff did claim that on weekly basis she would feel like something was crawling under skin and would get a scared feeling in her stomach.  She also stated that she does not like going to places by herself because she feels like people are staring at her.  Id.  Plaintiff also reported that she quit her job "because it was boring" and that she was waiting for a court date on her disability benefits.  Id.

Dr. Czapiewski found plaintiff to be neatly groomed; answered questions vaguely and then give more specific answers with the prompting of her 12-year old daughter (who was with her during the appointment); her affect was bland; she did not volunteer much information; she did not display any psychosis or suicidal thoughts; her insight and judgment were fair to poor; and she was attentive and orientated.   Tr. 294. Dr. Czapiewski's assessment was that plaintiff was suffering from borderline personality disorder, compulsive gambling, and bipolar disorder, but that her mood disorder was mostly under control.   Id.   While plaintiff described some symptoms of anxiety, Dr. Czapiewski concluded that her gambling was mostly under control.  Id.  Plaintiff was also encouraged to participate in a DBT program and to try Seroquel at bedtime to slow down her thoughts.  Id.

Plaintiff saw Putz twice in July of 2003.  Tr. 309, 310.  Plaintiff reported that she and her ex-husband had served court papers on each other regarding their daughter. Tr. 310.  She also reported that she was writing a book about her life.  Tr. 310.  She also claimed that she was not getting any sleep because she was not taking Seroquel and felt like she was going in circles.  Tr. 309-10.  She also stated that she was bored with her work.  Tr. 310.  On August 6, 2003, Putz reported that plaintiff noted no crisis events.   Tr. 308.   She also stated that she experienced an increase in sleep when taking her Seroquel.  Id.

On September 8, 2003, plaintiff saw Dr. Czapiewski in order to reevaluate her medications for her Bipolar II Disorder.   Tr. 291.   Plaintiff stated that she was in the process of divorcing her fourth husband and that she was living with a 23-year-old man. Id.  Plaintiff recognized that she was dependant on other people, that she lives in her own world and does not take responsibility for things.   Id.   She reported that she had

applied at Rainbow to be a check-out person, but stated that this was not the job she wanted and that she had no goals.  Id.  In addition, plaintiff indicated that she had started writing a book about her life but that she did not remember conversations.  Id. Dr. Czapiewski noted plaintiff's January 2003 neurosychometric evaluation, which showed that she had average intelligence with slowed processing speed and prominently impaired learning and memory in the context of performance.  Id. Otherwise, Dr. Czapiewski found that the results fell within normal limits.  Id. Dr. Czapiewski also noted that plaintiff had a lot of social chaos and was very impulsive, ambivalent and lived in the moment.  Tr. 292.  According to Dr. Czapiewski, the greatest benefit to plaintiff would be for her to get into a DBT program, which she had been encouraged to do so since January but had yet to do.  Id.  Plaintiff was told to come back for a follow-up in three months.  Id.

On October 22, 2003, plaintiff reported to Putz that she had met a new man and that she had been ordered by a court to pay child support for her daughter.  Tr. 307. Plaintiff expressed an interest in increasing her dosage of Dekapote.  Id.  Plaintiff was diagnosed with Bipolar II Disorder (296.89) and Borderline Personality Disorder (301.83).  Id.

On November 2, 2003, Putz gave a treatment update regarding plaintiff.  Tr. 306. According to Putz, plaintiff's main complaints were comprised of mood symptoms including poor sleep, low self-esteem and poor decision-making.  Id.  Putz also stated that plaintiff suffered from impulsive behavior with regards to gambling and relationships.  Id.  Putz diagnosis of plaintiff was as follows:

> AXIS I:       296.89 Bipolar II Disorder.
> AXIS II:      301.83 Borderline Personality Disorder
> AXIS III:     None.
> AXIS IV:      Occupational concerns

AXIS V:        Current GAF – 60

Id.   Putz noted that despite plaintiff's manipulative behavior when it came to relationships, she was straightforward when it came to medication.   Id.

On November 25, 2003, plaintiff went to Methodist Hospital, stating that she was having relationship problems and felt as though she wanted kill her boyfriend.  Tr. 255, 287.  Plaintiff stated that she did push her boyfriend, left with a packed bag and stated that she had no place to go.  Id.  She also indicated that she had thought of hurting herself, had done some cutting on her body earlier in the day and had been thinking about driving her car into a tree.  Id.  She did, however, state that she had never attempted to commit suicide.  Id.  She reported having trouble with relationships.  Id.  Plaintiff had numerous cuts on her right thigh that were very shallow and already scabbing over.  Tr. 256, 288.  On examination, plaintiff was alert and orientated; her speech was fluent; her gait was normal; her affect was flat; and plaintiff made good eye contact.  Id.  The impression of medical staff was that plaintiff was suffering from bipolar disorder and depression with suicidal ideation.  Id.  Plaintiff was to be transferred to United Hospital for inpatient admission and plaintiff agreed with this plan.  Id.

Plaintiff was admitted to United Hospital on November 26, 2003.  Tr. 267-68. Dr. Scott Yarosh, M.D. found plaintiff to be alert and orientated; her speech was soft and somewhat retarded in pace; she lacked any psychomotor agitation or retardation; her mood was very depressed; her thought content was not acutely suicidal; she was not psychotic; and she possessed limited insight and had poor judgment.  Tr. 267. Dr. Yarosh's diagnostic impression of plaintiff was as follows:

AXIS I:        1.    Bipolar affective disorder, type 2.
               2.    Pathological gambling by history.
               3.    Rule out alcohol abuse.
AXIS II:       Cluster B personality features.

```
AXIS III:        None.
AXIS IV:         Stressors are moderate.
AXIS V:          GAF about 40.
```

Tr. 267-68.

Dr. Yarosh stated that the level of Dekapote and Effexor would be increased and that plaintiff would do well to get involved in some DBT treatment.  Tr. 268.  Plaintiff also underwent a medical consult with Dr. Alan Melnychuk, M.D. on November 26, 2003. Plaintiff told Dr. Melnychuk that she did not have a permanent place to stay and had been bouncing from place to pace.  Tr. 264.  Dr. Melnychuk  found that plaintiff was alert and orientated x 3, was in no acute distress and answered questions appropriately. Id. Dr. Melnychuk also found that plaintiff made poor eye contact, that she had a flattened affect and a mood that was appropriate.  Tr. 265.  Dr. Melnychuk's impression of plaintiff was that while she presented with depression and suicidal ideation, there did not appear to be any underlying organic contribution to her presentation and her physical examination was normal.  Id.

Plaintiff was discharged on December 5, 2003.  Tr. 261. Dr. Yarosh's discharge diagnosis of plaintiff was as follows:

```
AXIS I:     1.    Bipolar affective disorder, type 2.
            2.    Pathological gambling by history.
            3.    Alcohol abuse.
AXIS II:    Cluster B personality features with borderline
            and narcissistic traits.
AXIS III:   None.
AXIS IV:    Stressors are moderate.
AXIS V:     Global Assessment of Functioning is 40, is
            about 50 on discharge.
```

Tr. 261.

In his discharge report, Dr. Yarosh indicated that plaintiff's condition was slightly improved on discharge and that her prognosis was guarded.  Id.  Dr. Yarosh provided in

a narrative that plaintiff presented with ongoing suicidal thoughts and that her medications were adjusted to calm her suicidality.  Tr. 262.  Dr. Yarosh stated that plaintiff did "stabilize over several days, but demonstrated issues in terms of motivation and frankly entitlement.  She was offered multiple opportunities to make contacts with case managers and participate in her discharge planning, but she did not seem interested in doing so.  She had a bit of covert, haughty, and slightly irritable attitude." Id.  Plaintiff was discharged to the Nancy Page Residence.  Id.

Plaintiff saw Putz on December 15, 2003.  Tr. 305.  Putz noted that plaintiff was impulsive with no follow-through and that she wanted things to happen "now."  Id. Plaintiff communicated to Putz that she believed that going back to the hospital was her only option.  Id.  The treatment plan for plaintiff was to improve her follow-through, reduce her reliance on fun, make choices when the decision did not necessarily result in fun and continue to take her medications as prescribed.  Id.

On the same day, plaintiff again went to United Hospital with a decompensation in mood and was seen by Dr. Yarosh.  Tr. 273.  According to Dr. Yarosh, the major obstacle to her successful discharge from her last admittance was her lack of initiative and expectation that others were going to find her a place to live and to provide a variety of other care for her.  Id.  Upon her last discharge, plaintiff stated that her placement did not work and she ended going back to her ex-boyfriend.  Id.  She began feeling more depressed and homicidal, feeling as though she was going to harm him and as a result, came back to the hospital.  Id. Dr. Yarosh noted that plaintiff had not followed through with psychiatric appointments 0r with her therapist, and in general, had been non-compliant with recommendations made to her upon her last admission.  Id.

A mental status examination of plaintiff showed that plaintiff was alert and orientated; her speech was clear, soft and productive; she had mild psychomotor retardation; was depressed; her affect was blunted; her thought content was relatively nonproductive but somewhat homicidal in nature; her thought form was impoverished; she had limited insight and poor judgment; and her cognitive function was fairly concrete.  Id. Dr. Yarosh's diagnosis of plaintiff was as follows:

AXIS I:      1.    Mood Disorder
             2.    Substance abuse.
AXIS II:     Cluster B personality features with borderline traits.
AXIS III:    None.
AXIS IV:     Stressors are moderate.
AXIS V:      Global Assessment of Functioning; about 40.

Tr. 273-74.  The plan for plaintiff was for her to be admitted, to look for other placement options, and to hold her to a strict behavioral contract with little enabling of her helpless behavior.  Tr. 274.

Plaintiff was discharged on December 18, 2003.  Dr. Yarosh's discharge diagnosis of plaintiff was as follows:

AXIS I:      1.    Bipolar affective disorder, type 2.
             2.    Posttraumatic stress disorder.
             3.    Pathological gambling.
             4.    History of substance abuse.
AXIS II:     Mixed personality disorder with dependant narcissistic traits and borderline traits.
AXIS III:    None.
AXIS IV:     Stressors are moderate.
AXIS V:      Global Assessment of Functioning was about 40 on admission, and was 45 on discharge.

Tr. 271. Dr. Yarosh noted that plaintiff's condition upon discharge was essentially unchanged and that her prognosis was poor   Id. Dr. Yarosh provided in a narrative that plaintiff presented again with suicidality after failing to go to Nancy Page Center and

follow through with therapy and psychiatric appointments.  Tr. 272.  Plaintiff was placed again at the Nancy Page Residence.  Id.

Plaintiff went to the Nancy Page Residence on December 18, 2003.  Tr. 336. Plaintiff was well-groomed, laughed, followed through with intake questions, was cooperative, alert and polite.  Id.  The intake assessment identified plaintiff's problems as homelessness, financial problems, gambling additions and risky sexual behaviors. Tr. 346.  Her strengths were that she was intelligent, articulate and that she had good insight.  Id.  On December 20, 2003, plaintiff represented that she was doing "o.k", that she liked the program, and was hoping the reach "level three" so she could qualify for four-hour passes.  Tr. 337.  On December 22, 2003, plaintiff requested a pass to go apply for assistance.  Tr. 333.  Plaintiff also participated in-group exercises.  Id.

Plaintiff also saw Dr. Czapiewski on December 22, 2003 for a follow-up .  Tr. 285. Plaintiff reported that she had been receiving therapy at the transitional home she was staying and that it was beneficial.  Id.  She also reported that she continued to see the boyfriend about whom she had the homicidal thoughts.  Id.  She reported that he also had bi-polar disorder and that he was probably not the best person for her, but that she was physically attracted to him.  Id.  Further, plaintiff reported that she had gambled away money that she received for Christmas and that she did not have the craving to gamble when she does not have funds available.  Id.  She rated her mood as 5 out of 10 and stated that her appetite and sleeping had been normal.  Id.  Dr. Czapiewski noted that plaintiff was alert and made good eye contact.  Id.  Dr. Czapiewski also found that plaintiff answered questions appropriately, showed no psychomotor slowing, and that her insight and judgment were impaired as evidenced by her compulsions, but were overall fairly intact.  Id.  Dr. Czapiewski's assessment of plaintiff was Bipolar II Disorder

and a recent history of depression and suicidal ideation that appeared to be improved. Tr. 286.  Plaintiff was told to continue with her medications and therapy visits and to see Dr. Czapiewski in four to eight weeks.  Id.

On December 24, 2003, plaintiff received an extension to stay at Nancy Page Center until January 1, 2004.  Tr. 331.  The social worker making the request for an extension stated that plaintiff's mental health continued to remain unstable, as leaving her home and her husband had proven to be difficult.  Id.  The social worker had noticed an improvement in her ability to focus and concentrate since her hospitalization.  Id. Plaintiff also showed improvement in developing the skills she needed to improve her mental health and to be independent.  Id.

On December 30, 2003, plaintiff left the Nancy Page Center without telling staff. Tr. 324.  On December 31, 2003, plaintiff called the Nancy Page Center and was told that she should not be allowed to use the program as a hotel.  Tr. 323.  She was not to be readmitted and told to go to a shelter.  Id.  There was a complaint that plaintiff was not performing the work required of her at the Nancy Page Center.  Id.

On January 24, 2004, Putz filled out another Medical Assessment to Work-Related Activity (Mental) form regarding plaintiff.  Tr. 301.  The form contained spaces for the provider to mark whether a patient had a very good, good, fair, or ability to conduct a work related task.  Id.  With regards to making occupational adjustments, Putz concluded that plaintiff had a fair ability to deal with the public, use judgment, function independently, and maintain concentration; and a poor ability to follow work rules, relate to co-workers, interact with supervisors, and deal with work stresses. Tr. 301-02.  In a narrative, Putz stated that plaintiff had a difficult time with focus and attention and that she had few coping mechanisms.  Tr. 302.  With respect to making

work performance adjustments, Putz found that plaintiff had a fair ability to understand, remember and carry out complex job instructions; a good ability to understand, remember and carry out detailed job instructions; and a very good ability to carry out simple job instructions. Id. In his narrative, Putz noted that plaintiff's attentional issues would limit her and that when things were stressful, plaintiff was apt to make choices that would make the situation worse. Id. As it related to making personal-social adjustments, Putz indicated plaintiff had a fair ability to maintain her personal appearance, and a poor ability to behave in an emotionally stable manner, relate predictable in social situations, and demonstrate reliability. Tr. 303. Putz made these findings on the basis of plaintiff's history of reactive and impulsive behaviors. Id. Putz also opined that plaintiff was emotionally labile, which could potentially escalate even in stable work environments. Id. In addition, Putz stated that plaintiff did not have the ability manage any benefits in her own best interest. Id.

In a March 4, 2004 letter to plaintiff's legal counsel, Putz stated that plaintiff's current difficulties centered on her mental health symptoms more than any chemical dependency issues. Tr. 371. Putz also indicated that plaintiff's functioning had deteriorated since June 25, 2002, as she had exhibited symptoms and behaviors that had necessitated psychiatric hospitalization. Id. According to Putz, plaintiff continued to make poor relationship choices, which resulted in her anxious and depressive features. Id. Putz noted that plaintiff had been referred to two different groups and he believed that she would do best in a supervised residential living facility. Id. Finally, Putz opined that if plaintiff is left to her own devices she would continue to make choices that would not lead to progress as it related to her mental health. Id.

2.     Testimony of ME

During the March 8, 2004 hearing, the ME testified that the medical evidence in the record evidenced that plaintiff was suffering from an affective disorder and anxiety related disorders and that she had suffered from four decompensations related to her affective disorder, which resulted in hospitalization for periods not longer than two weeks.   Tr. 411-13.   The ME stated that the medical record was clear that plaintiff stabilized relatively quickly after being hospitalized.  Tr. 425.  Based on his review of the medical record, the ME found that plaintiff had the capacity to concentrate and understand normal work-like procedures for short simple instructions, one-to-two step kinds of tasks; had the ability to carry out tasks with adequate persistence and pace for routine repetitive tasks, short simple instructions, and that she had the capacity to maintain attendance.  Tr. 413-14.  The ME also found that plaintiff would have be limited to superficial contact with co-workers and the public, that it appeared that she was able to cope with supervision in order to sustain a routine, and that her stress tolerance would limit her to routine repetitive work, short, simple, with one to two step instructions. Tr. 414.

In response to questioning by plaintiff's attorney, the ME stated that plaintiff had difficulty following through with her treatment plan and that to some degree plaintiff was choosing not to follow through with it.   Tr. 427-28.   The ME also stated that while the plaintiff's condition involved an issue of impulsivity in certain areas of her life, there was nothing in the record to indicate damaging impulsivity in the work setting or work-like setting, such as school.   Tr. 429.   To the contrary, the ME indicated that the record showed that as it related to work, plaintiff had stated that she got bored and she was not

motivated, and on other occasions, there were external stressors that caused her to leave programs.  Tr. 429-30.

The ME was also asked to comment an opinion on the January 24, 2004 assessment of plaintiff by Putz.  Tr. 414.  The ME stated that Putz's notes were limited and that Putz made comments that plaintiff was sporadic in her attendance and treatment and had a difficult time with focus and attention.  Id.  However, the ME found that these comments were contradicted by plaintiffs' neuropsychological evaluation in January 2003, which found that plaintiff did not have any impairment in attention.  Id. While the ME agreed that there was evidence that plaintiff had few coping mechanisms, he felt that in terms of dealing with work stresses, her lack of coping mechanisms were related to events external to work and there was no evidence that her moderate limitations due to reactive or impulsive behavior, occurred within groups or at school. Tr. 415.  The ME also stated that while Putz claimed that he had knowledge of plaintiff over a period off time, he only had fifteen sessions with plaintiff since March of 2002 and most of the visits pertained to crises management.  Id.  Further, the ME testified that Putz had assigned plaintiff a GAF of 60 as of November of 2003, which indicated a moderate degree of symptomology and moderate degree of limitations.  Id.

3.    Analysis

Based on the totality of the record before the ALJ, the Court finds that Putz's opinions were not supported by objective clinical findings and were inconsistent with his own progress reports and the opinions of other medical experts.  See Prosch, 201 F.3d at 1012-13 (quoting 20 C.F.R. § 404.1527(d)(2)) (concluding that the ALJ was correct in not giving controlling weight to a treating physician's opinion where such opinion was unsupported by clinical signs and inconsistent with the physician's own prior

evaluations); <u>see</u> <u>also</u> 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").   The Court also finds that the ALJ did not substitute her own opinion for that of Putz, and her decision not to rely on Putz's opinions on plaintiff's ability to work is supported by substantial evidence in the record.

As an initial matter, the Court observes that the ALJ cannot determine plaintiff's RFC without a medical opinion to support that opinion.  <u>See</u> <u>Lauer v. Apfel</u>, 245 F.3d 700, 703-04 (8th Cir. 2001).  The ALJ met that criteria – she  indicated in her decision that she gave significant weight to the testimony of the ME in determining plaintiff's RFC.  (Tr. 28).  <u>See</u> 20 C.F.R. § 416.927(f) (allowing the ALJ to ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments).

With respect to the ALJ's decision to discount Putz's opinions, according to Putz's January 2004 mental assessment, plaintiff possessed no ability to follow work rules, relate to co-workers, interact with supervisors and deal with work stress because she had difficulty with focus and attention and she had few coping mechanisms. Tr. 301-02.   Relying on the opinions of the ME, the ALJ determined that Putz's conclusions were not supported by objective medical findings in the record, as evidenced by the January 2003 neurological evaluation of plaintiff, and the evidence showing that plaintiff's psychiatric condition always stabilized quite quickly when she was motivated to follow through with prescribed treatment.  Tr. 28.   This reasoning is supported by substantial evidence in the record.

First, Putz's opinions bearing on plaintiff's ability to sustain employment were inconsistent with his own treatment records.  The "ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.") (citation omitted) (emphasis added). Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  For example, Putz contradicted his opinion that plaintiff did not have the ability to follow work rules when he later opined in the same report that she had a "very good" ability to understand, remember and carry out simple instructions.  Tr. 301-02.

Similarly, Putz's opinion that plaintiff was not capable of relating to co-workers and interacting with supervisors is not supported by the objective medical evidence in Putz's notes.  To the contrary, the record indicates that plaintiff reported in September 10, 2002 that she started school.  Tr. 207, 210.  There is no mention by Putz (or any other medical provider) that plaintiff had difficulty in school dealing with professors or with students.  Similarly, she reported to Putz in April 2, 2003 and to Dr. Czapiewski again on April 8, 2003, that she had started a job in Burger King.  Tr. 295, 311.  Neither provider indicated that plaintiff had difficulty dealing with her co-workers or supervisors at Burger King.  Instead, plaintiff reported to Putz on June 24, 2003, that she quit her job at Burger King "because it was boring" and that she was waiting for a court date on her disability benefits.  Tr. 293.

With respect to Putz's opinions that plaintiff has difficulty with focus and attention, again, Putz's own statements on the January 2004 assessment that plaintiff retained a fair ability to understand, remember and carry out complex job instructions; a good ability to understand, remember and carry out detailed job instructions; and a very good ability to carry out simple job instructions contradicted this opinion.  Tr. 302.

38

With regard to plaintiff's ability to make personal-social adjustments, Putz stated that plaintiff had a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.   Tr. 303.   While these assessments were consistent with his September 8, 2002 evaluation of plaintiff (Tr. 205), his opinions in the the September 2002 assessment were directly contradicted by the treatment plan he put in place for plaintiff the next month, which included plaintiff applying for and obtaining a job.   Tr. 205, 207.   His September 2002 assessment also was at odds with his June 25, 2002 consultation with Konke, the state agency physician, where Putz stated that plaintiff was socially active, had a good social support system, liked to go out with friends, had improved on medications, her prognosis was fair and she appeared to tolerate more than brief and superficial interactions.   Tr. 212.

Putz's limitations on plaintiff ability to work further conflicted with the GAF score of 60 that he assigned to plaintiff on November 2, 2003.   Tr. 306. See Goff v. Barnhart, 421 F.3d 783, 791 (8th Cir. 2005) (concluding that the ALJ was not compelled to give controlling weight to a treating physician where the physician's GAF score of 58 was inconsistent with the physician's opinion regarding limitations).   Even on December 15, 2003 (after her hospitalization on November 25, 2003), when plaintiff stated that she felt as though going back to the hospital was her only choice, there was no mention by Putz that she should do so.   Tr. 305.   Instead, in his treatment plan, he noted improper follow-through by plaintiff, that she should seek financial assistance or go to the Nancy Page Center, and that she should reduce making decisions on the basis of what she perceived to be "fun".   Id.

In sum, Putz's treatment notes for plaintiff are inconsistent with his claims that plaintiff lacked the characteristics necessary to sustain employment, and demonstrate that his opinions were not entitled to significant weight.

Putz's opinions of extreme limitations are also in conflict with the rest of the medical record.   First, during plaintiff's January 2003 hospitalization, she told Dr. Rittberg that she had filed for Social Security Disability and that she was "hoping that this hospitalization [would] be helpful in her obtaining Social Security Disability."  Id. Dr. Rittberg told plaintiff the more relevant issue to her obtaining a benefit was her noncompliance with outpatient recommendations and the lack of follow-through with the prescribed treatment plan on her part.  Id.  Dr. Rittberg noted in his report that after plaintiff's previous hospitalization, there had been put in place a well thought-out discharge plan for continued follow-up with plaintiff's psychiatrist and individual therapist and her attendance in a DBT program.  Id.  However, Dr. Rittberg found that plaintiff's follow-through with her prescribed treatment was poor.  Id.

Second, plaintiff's neuropsychological evaluation in January 2003was inconsistent with Putz's limitations, as it showed that her overall intellectual functioning was average, including her divided attention and sustained attention, with only moderate impairments to her memory.  Tr. 363, 414.

Third, the opinions of other providers who provided treatment to plaintiff are not consistent with Putz's extreme limitations.   On April 8, 2003, plaintiff reported to Dr. Czapiewski that she was doing "alright" and that she was stable except for her gambling.  Tr. 295.  Plaintiff also reported that she had started a part-time job at Burger King.  Id.  Dr. Czapiewski's assessment was that plaintiff's major problem was her gambling.  Tr. 296.  Plaintiff next saw Dr. Czapiewski on June 24, 2003.  Tr. 293.

Plaintiff reported that she was doing well and had no complaints of depression or mood swings, although there were certain things that would "set her off."  Id.  She reported that she felt hopeful that things would get better.  Id.  Plaintiff also reported that she quit her job "because it was boring" and that she was waiting for a court date on her disability benefits.  Id.

During her November 2003 hospitalization, Dr. Yarosh found that plaintiff did "stabilize over several days, but demonstrated issues in terms of motivation and frankly entitlement.   She was offered multiple opportunities to make contacts with case managers and participate in her discharge planning, but she did not seem interested in doing so.   She had a bit of covert, haughty, and slightly irritable attitude."  Tr. 263. When plaintiff again presented herself at the hospital on December 15, 2003, Dr. Yarosh found that the major obstacle to her successful discharge from her last admittance, as opposed to any underling mental limitations, was her lack of initiative and expectation that others were going to find her a place to live and to provide a variety of other cares for her.  Tr. 273.  Dr. Yarosh noted that plaintiff had not followed up with psychiatric appointments, had not followed up with her therapist and in general had been non-compliant with recommendations made to her upon her last admission. Id.  Further, on December 22, 2003, Dr. Czapiewski found that plaintiff answered questions appropriately, showed no psychomotor slowing, her insight and judgment were impaired as evidence by her compulsions, but were overall fairly intact.  Tr. 285. Id.  Plaintiff was told to continue with her medications and therapy visits and told by Dr. Czapiewski to see her again in four to eight weeks.  Tr. 286.

Fourth, the reports from the Nancy Page Residence also cut against the credibility of Putz's limitations.  Tr. 336.  On intake, plaintiff was observed to be well-

groomed, she laughed, she followed through with intake questions, was cooperative, alert and polite.  Id.  The intake assessment identified plaintiff's problems as homelessness, financial problems, gambling additions and risky sexual behaviors.  Tr. 346.  Her strengths were that she was intelligent, articulate and that she had good insight.  Id.  On December 20, 2003, plaintiff represented that she was doing "o.k", that she liked the program, and was hoping the reach "level three" so she could qualify for four-hour passes.  Tr. 337.  A social worker at the Nancy Page Center had noticed an improvement in plaintiff's ability to focus and concentrate since her hospitalization. Tr. 331.  Plaintiff also showed improvement in developing the skills she needed to improve her mental health and to be independent.  Id.  However, on December 30, 2003, plaintiff left the Nancy Page Center without telling staff.  Tr. 324.

Finally, Putz's opinions of extreme limitations are inconsistent with the opinions of the state agency physician and the ME.  On June 25, 2002, after a consultation with Putz and a review of plaintiff's file, state agency psychologist Konke concluded that plaintiff had the mental residual functional capacity to concentrate on and understand routine, repetitive tasks, and three and four step uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.  Tr. 232.  Konke also found that plaintiff's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks; plaintiff's ability to interact and get along with co-workers and the public was found to be moderately impaired, however, adequate for brief and superficial contact; plaintiff's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customer work settings; and plaintiff's ability to handle

stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.  Id.  Dr. Alsdruf affirmed Konke's report in 2003.  Tr. 232, 239.

Similarly, the ME, found that plaintiff had the capacity to concentrate and understand normal work-like procedures for short simple instructions, one-to-two step kinds of tasks; had the ability to carry out tasks with adequate persistence and pace for routine repetitive tasks, short simple instructions, and that she had the capacity to maintain attendance.  Tr. 413-14.  The ME also found that plaintiff would have be limited to superficial contact with co-workers and the public, that it appeared that she was able to cope with supervision in order to sustain a routine, and that her stress tolerance would limit her to routine repetitive work, short, simple, with one to two step instructions.  Tr. 414.

In summary, the ALJ's decision to not give the plaintiff's treating psychologist, Putz, controlling weight with regard to his finding of extreme functional limitations is supported by substantial evidence, as Putz's opinions were not supported by objective clinical findings and were inconsistent with his own progress reports and the opinions of other medical experts.

### B.     Failure to Consider Plaintiff's Psychiatric Impairment as Reason for her Failure to Follow Prescribed Treatment

Plaintiff has focused on the ALJ's finding that she was not sufficiently motivated enough to follow through with recommended day treatment.  See Pl.'s Mem. at pp. 12-13.  In particular, citing to Social Security Ruling ("SSR") 82-59, plaintiff claimed that the ALJ erred by failing to evaluate whether plaintiff's reason for failing to follow prescribed treatment, is justifiable.  Id. at p. 13. However, SSR 82-59 addresses the failure to follow prescribed treatment by claimants who have already been found disabled.  See, e.g.,

Zervas v. Barnhart, No. 05 Civ. 2133, 2007 WL 1229312, at *4 (E.D.N.Y. Apr. 26, 2007);

Barton v. Astrue, 495 F. Supp.2d 504, 509 (D. Md. 2007) (citing SSR 82-59) ("According

the Commissioner's own rules and regulations, one must be found to be disabled before

non-compliance will be the basis to deny benefits. Clearly that is not the circumstance in

this case, because the ALJ found that Claimant was not disabled."); Dangerfield v.

Barnhart, No. CIV.A.04-CV-5271, 2006 WL 2927641 at *5 (E.D. Pa. Oct. 11, 2006)

("SSR 82-59 applies only if the ALJ determines that an individual's impairments

preclude her from engaging in substantial gainful activity, i.e., it applies only if the ALJ

finds that the individual would otherwise be found to be disabled under the Act."). SSR

82-59 is not applicable to this case, as the ALJ never concluded that plaintiff was

disabled under the Act.

### C.   Plaintiff's Subjective Testimony

Failure to give some consideration to a claimant's subjective complaints is

reversible error.   Brand v. Secretary of the Dept. of Health, Educ. and Welfare,

623 F.2d 523, 525 (8th Cir. 1980).  "[A] headache, back ache, or sprain may constitute a

disabling impairment even though it may not be corroborated by an x-ray or some other

objective finding."   Id.   An ALJ must consider a claimant's subjective complaints,

regardless of whether they are corroborated by objective medical findings.  Id.; see also

Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991).  On the other hand, "we will not

substitute our opinions for that of the ALJ, who is in a better position to assess a

claimant's credibility."  Id. (citing Woolf, 3 F.3d at 1213).

In considering a claimant's subjective complaints of disability, the ALJ must

assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler,

739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

    1.    the claimant's daily activities;

    2.    the duration, frequency, and intensity of the pain;

    3.    precipitating and aggravating factors;

    4.    dosage, effectiveness, and side effects of medication;  and

    5.    functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same); Baumgarten v. Chater, 75 F.3d 366, 368 (8th Cir. 1996) (same); Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (same); Cline, 939 F.2d at 565 (same); Callison, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (same).   "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207.

    "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole."   Johnson, 87 F.3d at 1017 (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).   "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence."   Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 207.   The ALJ may not disregard a claimant's subjective complaints solely because he or she believes the objective

medical evidence does not support them.   Griffon v. Bowen, 856 F.2d 1150, 1154 (8th Cir. 1988).

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."   Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).   "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Cline, 939 F.2d at 565.

Here, plaintiff argued that the ALJ and the Appeals Council erred by failing to afford credibility to her subjective complaints of pain.   The sum total of plaintiff's argument was that the ALJ "failed to evaluate all the required [Polaski] factors", and she limited herself to "some medical reports and other complaints and nothing more."   See Pl.'s Mem. at. p. 15.

The ALJ found that plaintiff's subjective complaints of disabling depression, anxiety, and a personality disorder not fully credible.   Tr. 29.   In making this determination, the ALJ noted that she considered the factors under Polaski in analyzing plaintiff's subjective complaints of pain.   Tr. 27, 29.   In this regard, the ALJ examined plaintiff's activities of daily living, work history, medications, treatment and her non-compliance with the prescribed medical care, and the medical evidence as it pertained to plaintiff's claims of limitation.   Tr. 27-29.   While the ALJ did not explicitly and discretely analyze plaintiff's credibility in the format set forth under Polaski, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.   See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by

evaluating the claimant's testimony under the <u>Polaski</u> factors and by identifying inconsistencies between the claimant's statements and evidence in the record); <u>see also</u> <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations).

In this case, the ALJ's credibility determination is supported by substantial evidence in the record as a whole. As an initial matter, this Court notes that the ALJ did take into account plaintiff's subjective complaints. Plaintiff testified at the hearing that the reason why she could not work was that she would get really anxious and panicky every time she started a job. Tr. 387. Plaintiff also stated that she was depressed, in that she did not feel happy. Tr. 393. Further, plaintiff indicated that her primary health problem was her borderline personality disorder and that most troubling part of this condition was her inability to make choices for herself, like what to eat. Tr. 406. The ALJ found that plaintiff's subjective complaints to be partially credible. Tr. 29. This is reflected in the ALJ's statement, "because of the claimant's testimony that she does not like to be around other people, and does not do well under stress, the undersigned has limited her to light work activity that involved only brief and superficial contact with co-workers, supervisors, and the public, and which is performed in a low stress environment." <u>Id.</u>

Neverthless, the medical record does not support plaintiff's subjective complaints of disabling impairments. For example, plaintiff claimed that could not work because she would get anxious and panicky every time she started a job. However, the medical records show that plaintiff started school and started a job at Burger King during her claimed period of disability. Tr. 210, 295. She then quit the Burger King job because

she was bored.  Tr. 293.  There is no support in the medical records that she quit school or her job due to anxiety or panic attacks.

With regards to plaintiff's claims for depression, the record shows evidence of her depression, and the ALJ acknowledged that plaintiff was suffering from depression. Tr. 31.  However, in plaintiff's January 24, 2003 discharge mental status examination, Dr. Rittberg opined that plaintiff did not present significant clinical symptoms of major depressive disorder, although at times she seemed sad.  Tr. 224.  On December 22, 2003, after the hospitalizations in November and December of 2003, Dr. Czapiewski noted that plaintiff's recent history of depression and suicidal ideation appeared to be improved to the point where she only wanted to follow up with plaintiff in four to right weeks.  Tr. 255, 273, 287, 286.  Moreover, plaintiff's explanation that what she meant by claiming that she was depressed is that, "I don't feel happy," does not equate to a limitation to work in of itself.  Tr. 393.  If such were the case, much of the working population in this country would be seeking social security benefits.

Plaintiff's claim that her borderline personality disorder makes it impossible for her to make decisions (i.e., what to eat for breakfast) is similarly not supported by the medical record.  While there is evidence in the record that plaintiff makes poor choices, there is nothing in the medical record to suggest that she has trouble making decisions.

The ALJ properly also considered plaintiff's past work history as a factor undermining plaintiff's credibility.  Tr. 28.  A claimant's intention to work tends to prove that she is able to work.  See Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994). Plaintiff represented that she was in a technical school program to become a medical technician and that she started a job at Burger King, which she quit out of boredom. Tr. 111, 210, 293, 295.  In addition, plaintiff reported on September 8, 2003 that she had

applied at Rainbow to be a check-out person, but that this was not the job that she wanted. Tr. 291. Further, plaintiff reported to the ALJ that she started two jobs in 2004, which she quit within days. Tr. 387. Plaintiff's attempts and desire to obtain employment and education are admirable. At the same time, they place the credibility of her subjective complaints in doubt.

Further, the ALJ properly concluded that plaintiff's noncompliance with medical treatment cut against the credibility of her subjective complaints (Tr. 28). See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may consider noncompliance with medical treatment in discrediting subjective complaints). The record is replete with examples of plaintiff's non-compliance with the recommendations by her medical providers for treatment including: (1) repeated failures to participate in a DBT program, despite the numerous recommendations by her medical providers to do so; (2) leaving early from a gambling treatment center, and against the recommendation of staff; and (3) failing to follow the prescribed treatment program at the Nancy Page Center. Tr. 190, 262, 268, 272, 294, 296, 315-17 323, 324, 336.

Finally, the ALJ properly concluded that the record shows that plaintiff was able to engage in a variety of daily activities throughout the period of time she claims to have been disabled. Tr. 27. In particular, plaintiff represented that she sang karaoke, read, played card, went out to eat daily, talked daily on the telephone daily, visited relatives, drove until she had her license taken away due to back child support payments, and that she "hangs" out with her friends (playing games and talking with them). Tr. 107, 109 387-89.

Although a plaintiff does not need to establish that she is bedridden to be disabled, a claimant's credibility regarding subjective complaints of pain, fatigue, and

depression can be undermined by daily activities.  See Haley v. Massanari, 258 F. 3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (concluding that the credibility of claimant's allegations of disabling pain was undermined by his daily activities, including caring for children, driving, and occasional grocery shopping).

Ultimately, the question the ALJ was required to answer was not whether plaintiff suffered from mental impairments, but whether her subjective complaints prevented her from performing any type of work.  See McGinnis v. Chater, 74 F.3d 873, 874 (8th Cir. 1996) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)).  For all of the reasons stated above, this Court concludes that the ALJ properly assessed plaintiff's RFC and her subjective testimony in light of the inconsistencies between the record and plaintiff's subjective complaints.  See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991) (finding that if the ALJ explicitly discredits the claimant's testimony and gives a reasoned analysis, it is proper to defer to the ALJ's determination).

## VI.   VE TESTIMONY

"Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence."  Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).  A

proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant.  Id. at 676.  While a hypothetical question must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true.  Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991); see also Daniel v. Barnhart, 2002 WL 31045847 at *4 (D. Minn. Sept. 10, 2002) ("'[T]he ALJ is only required to incorporate into the hypothetical those impairments and limitations which have been accepted as credible.'")  (quoting Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997)).

Plaintiff argued that the ALJ failed to include in the hypothetical question all of the functional limitations imposed by Putz and plaintiff's subjective complaints.  See Pl.'s Mem. at p. 16. Since this Court has concluded that the ALJ did not improperly discount the opinion of Putz and plaintiff's subjective complaints, the RFC was properly determined and the VE's testimony, which considered all of her credible impairments and limitations, was appropriate.  Therefore, the ALJ reasonably relied on the VE's testimony that plaintiff could perform a significant number of jobs existing in the economy.

Plaintiff next asserted that the ALJ improperly relied upon the opinions of the VE because the VE was unable to provide a legal or vocational definition for one of the limitations imposed by the ALJ; that is, that the hypothetical plaintiff should be able to engage in light work involving "only brief and superficial contact" with co-workers, supervisors and the public.  See Pl.'s Mem. at p. 15, Tr. 438-441.  This argument finds no support in the facts and plaintiff cited no law as authority for this contention.  According to the VE, these terms are standard terms used by vocational experts in the industry.  Tr. 438-39.  In fact, the VE's testimony was consistent with Putz's comments

to state agency consultant Konke, when he indicated to her that plaintiff appeared to "tolerate more than brief and superficial interactions." Tr. 212.

Finally, plaintiff contended that the ALJ failed to follow the social security rulings regarding reconciling the VE testimony with the Dictionary of Occupational Titles ("DOT") and its companion publication the Selected Characteristics of Occupations ("SCO"). See Pl.'s Mem. at p. 15. In particular, plaintiff maintained that because the VE did not consult the SCO, the jobs provided to the ALJ by the VE were not supported by substantial evidence. Plaintiff points to no substantive error, and cites to no authority that states an ALJ must question the VE as to whether a discrepancy exists under both the DOT and the SCO. Social Security Ruling 00-4p, makes clear that the SCO is a companion publication to the DOT. It explicitly states that the "evidence provided by a VE . . . should be consistent with the occupational information supplied by the DOT." SSR 00-4p, Policy Interpretation Ruling: Titles II And XVI: Use of Vocational Expert and Vocational Specialist Evidence, and other Reliable Occupational Information In Disability Decisions 2000 WL 1898704 at *2 (December 4, 2000). If there is a conflict between the DOT and the VE's evidence, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE . . . ." Id.

The ALJ asked the VE whether there was any discrepancy between his testimony and the DOT, to which the VE responded, "No." Tr. 435. Plaintiff did not identify a conflict at the time of the hearing, and similarly fails to do so now.

## RECOMMENDATION

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is supported by substantial evidence on the record as a whole.

THEREFORE, IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 12] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 15] be **GRANTED**.


Dated:       February 8, 2008

                                    *s/ Janie S. Mayeron*
                                    JANIE S. MAYERON
                                    United States Magistrate Judge


        Pursuant to Local Rule 72.1(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **February 27 2008** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.